IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 2:21-cv-977 |
| | ) | |
| PERRY HOMES, INC., | ) | |
| ALLYSON WHITTINGTON, and | ) | Chief Magistrate Judge |
| ROBERT WHITTINGTON, | ) | Cynthia Reed Eddy |
| | ) | |
| Defendants. | ) | |
| | ) | |

**OPPOSITION BY THE UNITED STATES OF AMERICA TO
DEFENDANTS' MOTION TO DISMISS**

Plaintiff United States, through its attorneys, submits this opposition to the Motion to Dismiss (ECF 19, or "MTD") filed by Defendants, Perry Homes, Inc., Allyson Whittington, and Robert Whittington (collectively "Defendants" or "Perry Homes"). For the reasons stated herein, the Court should deny Defendants' Motion.

**I.    Introduction**

The United States brings this action under the Fair Housing Act ("FHA") on behalf of Southwestern Pennsylvania Legal Services (SWPLS) - the "aggrieved person" in this case.[1] SWPLS conducted fair housing testing that demonstrated that Defendants prohibit prospective tenants with a disability-related need for an emotional support animal from keeping their support animals in their homes at properties owned by the Defendants. The United States alleges that Defendants' prohibition constitutes unlawful housing discrimination based on disability under the FHA.

---

[1] *See* 42 U.S.C. § 3612(o).    The FHA defines "aggrieved person" as "any person who -- (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur."   42 U.S.C. § 3602(i).

Contrary to Defendants' contentions, the United States' Amended Complaint adequately pleads that Defendants or their agents: (i) caused injury to SWPLS in the form of diversion of its resources and frustration of its mission; (ii) made statements expressing a "preference, limitation, or discrimination based on disability," in violation of 42 U.S.C. § 3604(c); (iii) refused to rent or otherwise made their apartments unavailable to persons with disabilities who need an accommodation to keep an emotional support animal, in violation of 42 U.S.C. § 3604(f)(1); (iv) discriminated against individuals with disabilities in the "terms, conditions or privileges" of rental by refusing to permit emotional support animals, in violation of 42 U.S.C. § 3604(f)(2); and, (v) refused to make reasonable accommodations in rules, policies or practices to allow persons with disabilities who need them to keep emotional support animals in their apartments, in violation of 42 U.S.C. § 3604(f)(3)(B).

## II.    Statement of Facts

SWPLS is a non-profit legal aid organization, located in the Commonwealth of Pennsylvania. ECF 17, Complaint ¶ 12.  Through a component of the organization called the "Fair Housing Law Center," SWPLS provides education and legal representation to ensure that Pennsylvanians have access to housing free from discrimination.  *Id*. ¶ 13.  SWPLS represents victims of housing discrimination and conducts testing, training, and outreach to prevent housing discrimination in western Pennsylvania and northern West Virginia.  *Id.*

From October 2018 through February 2019, SWPLS conducted multiple phone tests to determine if Defendants would allow tenants with a disability-based need for an emotional support animal to rent units at Defendants' properties.  *Id*. ¶ 19.  SWPLS conducted its first test on October 19, 2018, and based on that test, did follow up tests that verified the discriminatory housing practices of the Defendants.  *Id*. ¶¶ 20-24.

On each occasion, SWPLS's tester posed as an applicant for a rental unit, and stated to the agents of the Defendants that he or she was inquiring about the availability of a unit for rent; that a member of his or her household had a specific emotional support animal (i.e., a dog) to help him or her; and that he or she had or could provide documentation of the person's need for the specific animal from a health care provider. *Id*. ¶¶ 20-24. Aside from the first test, each tester-applicant also specified the nature of the household member's disability (Autism, Post-Traumatic Stress Disorder, Stroke). *Id.* ¶¶ 21-24. The agents of the Defendants responded similarly to each applicant, stating that although Perry Homes allowed service animals, it did not allow emotional support animals. *Id.*[2]

Defendants' actions caused SWPLS to suffer injuries, which include diversion of resources from activities that the organization would otherwise have undertaken in order to devote those resources to identifying, investigating, evaluating, and counteracting the discriminatory housing practices of the Defendants. ECF 17 ¶¶ 26, 36. SWPLS trained and instructed testers, prepared tester profiles, coordinated tests, organized appropriate follow-up tests, obtained reports from testers, and analyzed the information in those reports. *Id.* As a result of this diversion of resources, SWPLS was unable to undertake other planned enforcement activities, including steps to enhance its outreach capabilities, and conducting other fair housing testing, education, and outreach in its service areas. *Id.* The actions of the Defendants frustrated SWPLS's mission to ensure equal access to housing and

---

[2] Emotional support animals are assistance animals that are distinct from "service animals" as that term is used in the Americans with Disabilities Act (ADA). The ADA regulations define service animal as "any dog that is individually *trained* to do work or perform tasks for the benefit of an individual with a disability…." 28 C.F.R. § 36.104 (Department of Justice regulations implementing the ADA) (emphasis added). Unlike the ADA, the FHA does not require that an assistance animal be "individually trained or certified" for purposes of reasonable accommodation requests. *See* Exhibit 1, United States Housing and Urban Development (HUD) Guidance, FHEO-2013-01 at 2: *Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-Funded* Programs. Whether a person with a disability needs an emotional support animal as an accommodation or a service animal depends on the nature of the person's disability and the reason he or she needs the animal.

resulted in the need for additional remediation activities to counteract the discriminatory conduct of the Defendants. *Id.* ¶¶ 27, 36.

On July 23, 2021, the United States filed suit against Defendants. ECF 1. On October 8, 2021, the United States filed an Amended Complaint, alleging that Defendants violated the FHA, 42 U.S.C. §§ 3604 (c), (f)(1), (f)(2), and, (f)(3)(B). ECF 17 ¶¶ 33-34. The United States seeks damages to compensate SWPLS for its injuries and an order for declaratory and injunctive relief. *Id.* ¶¶ 36-37 and Prayer for Relief, ¶¶ 1-4.

**III.     The Amended Complaint Satisfies the Pleading Standards under Rule 12(b)(6)**

When ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Federal notice and pleading rules require the complaint to "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Phillips,* 515 F.3d at 232 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To test the sufficiency of the complaint, the court conducts a three-step inquiry. *See Santiago v. Warminster Township*, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* at 130 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. *Id.* at 131-32. Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." *Iqbal,* 556 U.S. at 679. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* at 678.  The Amended Complaint of the United States satisfies these standards.

IV.    **Argument**

      **A. The Allegations are Sufficient to Show that SWPLS has Suffered Injury**

          1.  <u>The Allegations Satisfy *Havens* and Third Circuit Precedent</u>

Defendants' contend that the United States fails to plead that SWPLS suffered "injury in fact." ECF 19-2.  As a preliminary matter, the United States is authorized on its own to bring this case for damages on behalf of the "aggrieved person," SWPLS.  *See*, 42 U.S.C. § 3612(o) ("after the election is made the Attorney General shall commence and maintain, a civil action on behalf of the aggrieved person in a United States district court seeking relief under this subsection…").  There is no question that this jurisdictional requisite has been met, and Defendants do not contend otherwise. Further, even under the "injury in fact" requirements developed in Supreme Court and Third Circuit precedent addressing the standing of organizational plaintiffs, SWPLS meets the standard in its own right where, as here, the discriminatory conduct of the Defendants caused SWPLS to suffer injuries in the form of diversion of resources and frustration of mission.  ECF 17 ¶¶ 26, 35-36.  Were it not for the discriminatory housing practices of Defendants, SWPLS would have been able to devote its resources to furthering other aspects of its planned outreach and educational activities.  *Id.*[3]

In *Havens Realty v. Coleman*, 455 U.S. 363 at 372 (1982), the Supreme Court emphasized that Congress intended standing under the FHA to "extend to the full limits of Article III and that

---

[3]Article III standing requires that a plaintiff show (1) it has suffered an injury in fact (2) that is fairly traceable to the challenged action of the defendant and is (3) likely to be redressed by a favorable decision.  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S.167, 180-81 (2000).  The standing inquiry is "focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed."  *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008); *Baker v. Carr*, 369 U.S. 186, 204 (1962) (same).  Defendants challenge only the injury in fact element in relation to SWPLS.

courts accordingly lack the authority to create prudential barriers to standing in suits brought under that section." *Quoting, Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, at 103, n. 9, 109 (1979).  Thus, the "sole requirement for standing to sue under § 812 [3612] is the Art.  III minima of injury in fact: that the plaintiff allege that as a result of the defendant's actions he has suffered 'a distinct and palpable injury.'" *Id*. at 372 (citations omitted); *see also*, *Bank of Am. Corp. v. City of Miami, Fla.*, 137 S. Ct. 1296, 1303 (2017) ("the  FHA's definition of person 'aggrieved' reflects a congressional intent to confer standing broadly").[4]   In the context of a motion to dismiss, the "[i]njury-in-fact element is not Mount Everest."  *Blunt v. Lower Merion School Dist.*, 767 F.3d 247 at 278, (3d Cir. 2014), quoting *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286 at 294 (3d Cir. 2005).  "The contours of the injury-in-fact requirement, while not precisely defined, are very generous," requiring only that claimant "allege [ ] some specific, 'identifiable trifle' of injury." *Id.*, quoting, *Bowman v. Wilson,* 672 F.2d 1145, 1151 (3d Cir.1982).

In *Havens*, the plaintiff, a fair housing organization named Housing Opportunities Made Equal (HOME), conducted testing to determine if housing providers were engaged in certain discriminatory housing practices, and broadly alleged in its Complaint as follows:

> Plaintiff HOME has been frustrated by defendant's racial steering practices in its efforts to assist equal access to housing through counseling and other referral services.  Plaintiff HOME has had to devote significant resources to identify and counteract the defendant's[sic] racially discriminatory steering practices.

---

[4] *See also*, HUD's commentary to the regulations implementing the FHA, stating that the term "aggrieved person" under the FHA "includes a fair housing organization as well as a tester or other person who seeks information about the availability of dwellings to determine whether discriminatory housing practices are occurring."  53 Fed. Reg. 44995 (Nov. 7, 1988); *see also* 54 Fed. Reg. 3238 (Jan. 23, 1989).

*Havens*, 455 U.S. at 379.  The Supreme Court found these allegations sufficient to show injury in fact, reasoning:

> If, as broadly alleged, the petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities-with the consequent drain on the organization's resources-constitutes far more than simply a setback to the organization's abstract social interests.

*Id.*  Thus, *Havens* established that diversion of resources and frustration of mission provide a basis for standing under the FHA.

The factual allegations of the United States regarding injury to SWPLS are similar to those of the fair housing organization in *Havens*.  SWPLS is a legal services organization with a fair housing component whose mission includes ensuring access to housing free from discrimination. Complaint, ECF 17 ¶ 13.  In particular, the organization represents victims of housing discrimination, conducts testing to investigate housing discrimination, and conducts training and outreach. *Id.*

SWPLS initiated testing to determine if Perry Homes was making units available to tenants or applicants who have a disability-related need to live with an emotional support animal.  *Id.* ¶¶ 14, 19.  As part of this process, SWPLS trained and instructed testers, prepared tester profiles, planned and coordinated tests, organized appropriate follow-up tests based on the results of the initial tests, obtained reports from testers, and analyzed information in those reports. *Id.* ¶ 26.

As a result of the discriminatory housing practices of the Defendants, SWPLS had to divert resources from other planned enforcement activities in its service area, and was unable to do work that it would have otherwise done because of time devoted to investigating Perry Homes' discriminatory conduct, with a consequent drain on the organization's resources.  *Id.*  Further, the discriminatory housing practices of the Defendants frustrated SWPLS's mission to promote and

ensure equal housing opportunities. *Id.* ¶¶ 27, 36. SWPLS's activities, undertaken in response to the discriminatory practices of the Defendants, give rise to SWPLS's damages, and are comparable to the allegations made by HOME in *Havens*. Accordingly, the allegations sufficiently plead injury in fact.

Defendants acknowledge the allegations regarding SWPLS' injuries, but argue that these allegations are merely "conclusory" and "inadequate." ECF 19-4, 5. Defendants not only ignore *Havens*, in which the allegations were "broadly alleged" as explained above, but also the law in this Circuit. In *Fair Hous. Rights Ctr. v. Post Goldtex GP, LLC*, 823 F.3d 209, 214 n.5 (3d Cir. 2016), the Third Circuit applied *Havens*, and held that the fair housing group had standing, because its "complaint alleges that the Appellees engaged in discriminatory housing practices, and that its mission to eradicate housing discrimination has been frustrated because it has had to divert resources in order to investigate and prosecute the alleged discriminatory practices in this case." *See also Alexander v. Riga*, 208 F.3d 419, 427 n.4 (3d Cir. 2000) (holding that a fair housing organization that "diverted resources to investigate and to counter the Rigas" has standing)*; Blunt v. Lower Merion Sch. Dist.*, 767 F.3d at 314 (parents' organization has standing because it "had to divert its already-scarce resources to mitigating" defendant's discriminatory conduct); *Fair Housing Rights Center in Southeastern Pennsylvania v. Morgan Props. Mgmt. Co.*, civil action no. 16-4677, 2017 WL 1326240 at *10 (E.D. Pa. April 11, 2017) (court relies on the complaint in *Goldtex* to support its holding that the plaintiff has standing to sue because the organization "was forced to conduct an extensive investigation of Defendants' discriminatory actions, and that the FHRC [plaintiff] had to divert significant resources in order to prevent discrimination").

The Defendants also contend that the United States fails to allege that SWPLS's investigation was "caused" by the discriminatory conduct of the Defendants, and that SWPLS "manufactured the injury on which its claims are based." ECF 19-6. Defendants misread the allegations that explicitly provide that:

> SWPLS suffered injuries *as a result* of Defendants' actions described in paragraphs 19-25 (emphasis added).

ECF 17 ¶ 26. Other allegations similarly emphasize that SWPLS' resources were diverted and its mission frustrated *by*, *due to*, or, *as a result of*, the discriminatory conduct of the Defendants. *Id*. ¶¶ 27, 36. The Amended Complaint describes additional follow up testing that SWPLS conducted once the initial test revealed the illegal conduct of the Defendants. *Id.* ¶¶ 21-24.

Courts in this circuit have found that a plaintiff's allegation that a defendant's discriminatory conduct caused an organization's diversion of resources and frustration of its mission is sufficient to survive a motion to dismiss. *Goldtex*, 823 F.3d at 214 n.5; *Riga*, 208 F.3d at 427 n.4; *see also*, *Disability Rights Pa. v. Pa. Department of Human Services*, civil action no., 19-cv-737, 2020 WL 1491186, *5 (M.D. Pa. March 27, 2020) (organization pleaded sufficient facts under Rule 12 (b)(6), where it alleged that "in response to Defendants' allegedly unlawful conduct, it redirected 'time, money, and resources' to investigate alleged abuses at the Centers").

Defendants' reliance on *Fair Hous. Council v. Montgomery Newspapers*, 141 F.3d 71, 77-80 (3d Cir. 1998) to support their contention that the United States cannot show that SWPLS's investigation was "in response to" Defendants' discriminatory conduct is misplaced. ECF 19-5. In *Montgomery Newspapers*, the court held that the plaintiff did not *prove* its allegations at the summary judgment stage. 141 F.3d at 76. The court stated: "[W]hile there is no dispute that the FHC's [plaintiff's] damage allegations track the language in *Havens and were sufficient to withstand a motion to dismiss*, something more than these naked allegations was required at the summary

judgment stage." *Id.* (emphasis added).   The allegations of injury in the Amended Complaint of the United States likewise track the language in *Havens*, and are sufficient to survive the motion to dismiss of Defendants.

            2.   <u>Other Standing Cases Defendants Cite are Distinguishable</u>

None of the standing cases Defendants cite in support of their arguments provide a basis for granting their motion.   In *Shield Our Constitutional Rights and J v. Hicks,* 2009 WL 3747199, at *5 (D. Md. Nov. 4, 2009), the plaintiff's complaint, which alleged only costs spent on "courts, attorneys, times, and efforts to help the victim," fell short of alleging diversion of resources.   Similarly, in *Memphis Ctr. For Indep. Living v. Woodglen Village Apartments Partn*., 2010 WL 145351 at *4 (W.D. Ten. Jan. 8, 2010), the plaintiff's pleadings were held to be inadequate where the plaintiff did not make any reference to "tester training, or employing testers."   Here, by contrast, the United States explicitly alleges that the injury related to diversion of resources grew out of SWPLS's investigation, testing, reporting, and analysis of the discriminatory practices of the Defendants.   ECF 17 ¶ 26.

In *Kingman Park Civic Association v. Gray*, 956 F. Supp. 2d 260 at 266 (D.D.C. 2013), plaintiff could only articulate a generalized mission - to protect the health and safety of its members - which the court held was a "type of abstract concern that does not impart standing."   Likewise, in *Food and Water, Watch Inc. v. Vilsack*, 808 F.3d 905, 920 (D.C. Cir. 2015), the court held that plaintiff alleged no more than an "abstract injury" where plaintiff's allegation turned on future expenditures of time and money.   Here, the Amended Complaint specifically alleges that SWPLS's mission, to eradicate housing discrimination, has already been affected by the discriminatory housing practices of the Defendants, and that SWPLS's resources were diverted from other planned enforcement activities due to Defendants' conduct. ECF 17 ¶¶ 26, 27, 36.

Finally, in *NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010), upon review of a full evidentiary record, the Fifth Circuit held that the plaintiff organization had only testified about the programs it could have undertaken but for Defendants' conduct, not those that it in fact put on hold.  In contrast, here, at the motion to dismiss stage, the United States alleges that SWPLS had to put aside certain planned enforcement activities as a result of the discriminatory conduct of the Defendants, and the record here has not yet been developed.  ECF 17 ¶ 26.

**B.   The Allegations of the United States that Defendants Told Applicants that Perry Homes Does Not Allow Emotional Support Animals Adequately Plead a Claim for Relief under 42 U.S.C. § 3604(c)**

Contrary to Defendants' suggestion, the United States is not challenging their no-pets policy as an expression of a "preference, limitation, or discrimination based on disability" under 42 U.S.C. § 3604(c) of the FHA.  ECF 19-7, 8.  The United States alleges Defendants expressed  a "preference, limitation, or discrimination" against persons with disabilities who have a disability-related need for an emotional support animal by stating to multiple tester-applicants over a period of time that emotional support animals are not allowed at properties of the Defendants.

The statements of the Agents of the Defendants to tenant applicants, such as "Perry Homes only accept[s] service animals that have been specifically trained, like a seizure detecting dog" (ECF 17 ¶ 20), and "Perry Homes only allows 'registered service animals' that have been trained for a specific duty" (*id*. ¶ 21), and, "unless they had documentation that the dog was a registered service animal, Perry Homes would not allow the dog" (*id*.), and, "the no pet policy could only be waived if the animal was a service animal … and they were not obligated to permit emotional support animals" (*id.* ¶ 22), are actionable under 42 U.S.C. § 3604(c).

The FHA makes it unlawful "[t]o make, print, or publish . . . or cause to be made, printed, or published any notice, statement or advertisement, with respect to the sale or rental of a dwelling that *indicates any preference, limitation, or discrimination based on ...disability.... or an intention to*

11

*make any such preference, limitation or discrimination."* 42 U.S.C. § 3604(c); *see also*, 24 C.F.R. § 100.75(a) (emphasis added).  This provision applies to all oral notices or statements by a person engaged in the rental of a dwelling. 24 C.F.R. 100.75(b).  "Openly discriminatory oral statements merit ... straightforward treatment."  *Soules v. U.S. Dept. of Hous. & Urban Dev.,* 967 F.2d 817, 824 (2d Cir. 1992).

A statement that suggests to an ordinary reader or listener that a particular protected group is preferred or disfavored for the housing in question violates §3604(c).  *Soules*, 967 F.2d  at 824.  An ordinary listener hears statements in context and "is neither the most suspicious nor the most insensitive of our citizenry." *Id.; see also Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 625 (S.D.N.Y. 2011).  Under the ordinary reader standard, §3604(c) reaches far beyond "outlaw[ing] only the most provocative and offensive expressions of racism or statements indicating an outright refusal to sell or rent [.]" *Ragin v. New York Times Co.*, 923 F.2d 995 at 999 (2d Cir. 1991).  The provision's use of the term "preference" necessarily includes "any [statement] that would discourage an ordinary reader of a particular [protected   class]." *Id*. at 999-1000.

Thus, in *Fair Hous. Justice Ctr., Inc. v. Cuomo,* No. 18-cv-3196, 2019 WL 4805550 at *2 and *15 (S.D.N.Y. September 30, 2019), landlords' statements to fair housing testers inquiring on behalf of relatives who use wheelchairs that, "wheelchairs are not allowed in the facility," indicated a "preference based on disability," and stated a claim under § 3604(c).  Likewise, in *Fair Hous. Justice Center v. Allure Rehab Servs., LLC*, No. 15-cv-6336, 2017 WL 4297237 at *6 (E.D.N.Y. September 26, 2017), landlords' statements to fair housing testers that they "refused to even consider providing ASL interpreters for the testers' relatives" indicated a preference based on disability, and stated a claim under § 3604(c).  *See also, Avakina ex rel. Fair Housing Council of Oregon v. Chandler Apartments, LLC*, civil action no. 6:13-cv-1776, 2015 WL 413813 *5 (D. Or. Jan. 30, 2015) *aff'd sub nom. Oregon Bureau of Lab. & Indus. ex rel. Fair Hous. Council of Oregon v. Chandler*

*Apartments, LLC*, 702 F. App'x 544 (9th Cir. 2017) (summary judgment granted in favor of testing organization where statements to testers that owner did not allow service animals are discrimination under 42 US.C.§ 3604(c)).

Notwithstanding these well-established principles, Defendants contend that there is no liability that attaches to *their* statements, because their agents *also* said they would allow "service animals," or "trained registered animals."  ECF 19-9.  But whether a trained service animal is permitted at the Perry Homes properties is irrelevant.  The gist of the claim of the United States is that Defendants prohibited a particular accommodation - an emotional support animal - for applicants who have a disability-related need for *this* accommodation, not an accommodation that may work for people with other types of disabilities.  A service animal is one type of assistance animal, while an emotional support animal is another type, fulfilling different and distinct disability-related needs. *See* Exhibit 2, FHEO-2020-01 at 3: *Assessing a Person's Request to Have an Animal as a Reasonable Accommodation Under the Fair Housing Act*.  Indeed, the Third Circuit underscored that permission to keep an emotional support animal is a particular type of reasonable accommodation in *Revock v. Cowpet Bay West Condominium Association*, 853 F. 3d 96 at 110 (3d Cir. 2017).  The court stated that "a reasonable accommodation under the Fair Housing Act may include the use of an emotional support animal in one's own home, despite the existence of a rule, policy or law prohibiting such an animal."

In sum, based on the authorities above, the repeated statements by Agents of the Defendants that they would not allow emotional support animals for prospective tenants who need them indicated a "preference, limitation, or discrimination" based on disability under § 3604(c).

### C. Testers Do Not Have to Be Persons with Disabilities and the United States Need Not Identify Actual Persons with Disabilities to Prevail in a Lawsuit under the FHA

Defendants contend that "fictional people cannot be victims of the discrimination outlawed by subsections (f)(1), (f)(2) and (f)(3)(B), because these kinds of discrimination can only exist if the victim has real disabilities or is associated with a person who has a real disability." ECF 19-10. Defendants further argue that "since a real disabled person is required for there to be unlawful discrimination based on disability, the Amended Complaint fails to allege any unlawful act that would make SWPLS an aggrieved person." *Id.* at 11. The arguments of Defendants are just another twist on their standing argument, and similarly have no merit.

First, there is nothing in the text of the FHA, nor supporting case law, that requires that the testers themselves be persons with disabilities, or that the United States identify an "actual" person with a disability to maintain this action on behalf of SWPLS. As the Supreme Court explained, testers are "individuals who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful practices." *Havens*, 455 U.S. at 373. *See also, Cuomo,* 2019 WL 4805550 at *2 and *13 (testers who posed as family members of older adults requiring wheelchairs established that defendant had a blanket policy of not allowing wheelchairs in their facility); *Allure Rehab Servs., LLC*, 2017 WL 4297237 at *2-3 (testers pretending to have deaf relatives who use ASL interpreters established that defendant had a policy of not providing ASL interpreters).

The Ninth Circuit, in *Oregon Bureau of Lab. And Industries ex rel. Fair Hous. Council of Oregon v. Chandler Apartments, LLC*, 702 Fed. Appx. 544 *546 (9th Cir. 2017) (unpublished decision), citing *Fair Hous. Council of San Fernando Valley v. Roommate.Com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012), addressed and rejected this very same argument where no plaintiff was disabled, and the testers were not persons with disabilities, stating: "FHCO [the fair housing organization] and

14

BOLI [the Oregon state enforcement agency] both have standing to sue under the FHA even though the testers they used were not actually disabled.  FHCO suffered injuries through the frustration of their organizational mission and diversion of resources."  Under the theory of the Defendants, a fair housing organization could never have statutory standing to bring claims under § 3604(f) on its own behalf because it could never have a handicap and be discriminated against on that basis.

Second, if Defendants are suggesting that only members of a protected class who are the targets of discrimination can be victims of a landlord's discriminatory housing practice, such contention has no merit.  The Supreme Court has time and time again rejected such a notion.  In *Trafficante v. Metropolitan Life Insurance Co*., 409 U.S. 205 (1972), the Court held that current apartment residents had standing to sue their landlord under the FHA for discriminating against minority rental applicants.  The Court held in *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91 (1979), that residents and a village had standing to sue realtors under the FHA who steered other home-seekers to different neighborhoods because of race.  In *Havens*, 455 U.S. 363, the Court held that a fair housing center, like SWPLS, had standing to sue landlords under the FHA based on the center's diversion of resources to combat landlords' unlawful steering of home-seekers because of race.  More recently, in *Bank of America,* 137 S. Ct. at 1303, the Court  held that the City of Miami could seek relief for injuries resulting from the banks' predatory lending practices, which caused lowered property values, reduced tax revenue, and increased the need for police and fire services. The Court held that the city could pursue its claims, and that these injuries – suffered by a city, not the abused borrowers – fell within the zone of interests protected by the FHA.  *Id*.

In each of these cases, the plaintiffs – the tenants already residing at a property, the village, the fair housing center, a municipal government – were not themselves members of the group of people subject, directly or indirectly, to a discriminatory housing practice, but each was ***injured*** by that practice.  The "zone of interest" under the FHA is as broad as the injury caused by a defendant's

violation of the FHA, and reaches entities beyond and other than those who are protected class members or were targeted by the discrimination at issue.

Finally, Defendants rely extensively on *Havens,* 455 U.S. 363, for the proposition that SWPLS's testers had to have been themselves persons with disabilities.  ECF 19-11.  Defendants rely on a portion of the *Havens* decision that relates to the circumstances under which a tester may be a plaintiff in her or his own cause for damages.  *Id.*; *Havens*, 455 U.S. at 373-74.  But the individual testers are not "aggrieved persons" in this case; the United States claims relief only for SWPLS, which, under *Havens*, and other myriad cases in this circuit has standing to sue.  *See infra*, Section III (A).[5]

### D.  The United States Sufficiently Pleads Claims under §§ 3604(f)(1), (f)(2), and (f)(3)(B)

1.  <u>Defendants' Rule Prohibiting Tenants with a Disability-Related Need for an Emotional Support Animal from Keeping One Discriminates and Makes Housing Unavailable to Certain Renters in Violation of § 3604(f)(1)</u>

Defendants contend that the language in 42 U.S.C. § 3604(f)(1), which provides that it is unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of disability," does not apply to SWPLS because its testers "cannot be victims of an unlawful refusal to rent when they never intended to rent in the first place." ECF 19-12.  Defendants have set up a straw man, because, as explained above, the United States does not

---

[5] In *Havens*, the housing provider informed a black tester that it had no available units, but told a white tester that it had availability.  The Supreme Court held that the provider violated the black tester's rights by providing inaccurate information as to availability, and the black tester therefore had standing.  455 U.S. at 374.  The Court held that the white tester did not have standing because the provider gave the white tester accurate information as to availability, and did not violate his rights under § 3604(d).  *Id.*  As indicated above, the United States does not seek relief for the testers in this case, only for the organization.  For this same reason, Defendants' reliance on *Bowman v. Wildwood of Lubbock, LLC*, civil action no. 5:19-cv-164, 2020 WL 10458628 (N. D. Tex. Oct. 23, 2020), and other tester cases is unavailing.  ECF 19-12.

claim that the testers are victims; the claim of the United States is limited to injury to the organization, SWPLS.

The discrimination claims of the United States for relief fall squarely within Section 3604(f)(1).  First, the United States pleads that, by refusing to allow applicants to have emotional support animals live with them at Defendants' properties, Defendants are refusing to rent to persons with disabilities who  need to live with such animals.  Blanket policies, that exclude persons with disabilities from becoming renters, violate § 3604(f)(1).  *See, e.g.*, *Cuomo,* 2019 WL 4805550 at *13-14 (the organizational plaintiff stated a claim under § 3604(f)(1) where testers, who applied for housing on behalf of persons using wheelchairs, were unable to complete the application process due to the landlords' practice of not renting to wheelchair users); *Morgan Props. Mgmt. Co.*, 2017 WL 1326240 at *4 (holding that the plaintiff organization stated a claim for discrimination under § 3604(f)(1) because the landlords' policy of not making adjustments for rental due dates "may well deter disabled persons [who rely on SSDI] from residing in Defendants' rental units"); *Cason v. Rochester Hous. Authority*, 748 F. Supp. 1002, 1007-9 (W.D.N.Y. 1990) (defendants violated § 3604(f)(1) by implementing a policy that applicants had to be capable of living independently).

Moreover, it is well-established that the phrase "otherwise make unavailable or deny, a dwelling" is a "catchall phrase [ ]" that "look[s] to consequences, not intent," *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 535 (2015), and reaches "a wide variety of discriminatory housing practices."  *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016).  The phrase "has been construed to reach every practice which has the effect of making housing more difficult to obtain on prohibited grounds."  *Thurmond v. Bowman*, 211 F. Supp. 3d 554, 564 (W.D.N.Y. 2016); *United States v. Yonkers Bd. of Educ.*, 624 F. Supp. 1276, 1291 n.9 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987), *cert. denied*, 486 U.S. 1055 (1988) (quotations omitted).  Here, the blanket practice of Defendants of not permitting emotional support

animals "otherwise make[s] unavailable or den[ies]"  apartments owned by Defendants to renters

with disabilities who need such accommodations.  Thus, the United States sets forth a claim for relief

under 42 U.S.C. § 3604(f)(1).

> 2.  <u>Defendants' Refusal to Allow Emotional Support Animals as an Accommodation</u>
>     for <u>Applicants who Need Them Constitutes Discrimination in the Terms, Conditions</u>
>     or <u>Privileges of Rental in Violation of § 3604(f)(2)</u>

Defendants contend that their refusal to allow persons with disabilities to keep emotional

assistance animals did not constitute discrimination "in the terms, conditions, or privileges of sale or

rental of a dwelling, or in the provision of services or facilities in connection with such dwelling,

because of a handicap" under 42 U.S.C. § 3604(f)(2), because they imposed the same terms on the

testers that they imposed on other applicants.  ECF 19-13.  Defendants miss the point.

The failure to permit emotional support animals as an accommodation in its apartments *is*

discrimination in the "terms, conditions, or privileges" of rental.  In *Castillo Condo. Ass'n v. U.S.

Dep't of Hous. & Urban Dev.*, 821 F.3d 92, 98 (1st Cir. 2016), a case involving a condo association's

refusal to permit a resident to keep an emotional support animal in his unit, the Court held that "the

Association's failure to provide a reasonable accommodation constituted discrimination against

Gimenez [the resident] in the terms and conditions of housing due to his disability and, thus, violated

yet another provision of the Act. *See id.* § (f)(2)." *See also*, *Bhogaita v. Altamonte Heights Condo.

Ass'n, Inc.*, No. 6:11-cv-1637, 2012 WL 10511 at *4 (M.D. Fla. Jan. 3, 2012) (denying defendant's

motion to dismiss on the ground that refusal to allow tenant's request to keep emotional support

animal "is properly actionable under [§ 3604] (f)(2)").[6] Similarly, the United States properly pleads

---

[6] The Eleventh Circuit ultimately affirmed the district court's grant of partial summary judgment on the plaintiff's reasonable accommodation claim finding that Defendants violated the FHA by failing to allow the condominium resident to keep his emotional support dog. *Bhogaita v. Altamonte Heights Condominium Ass'n, Inc.* 765 F.3d 1277, 1286-87 (11th Cir. 2014), *aff'ing*, *Bhogaita v.*

a claim under § 3604 (f)(2) by alleging that Defendants refuse to allow emotional support animals as accommodations for persons with disabilities who need them.

   3.   <u>Defendants' Refusal to Entertain Requests for Emotional Support Animals as an Accommodation for Persons with Disabilities Who Need Them Violates § 3604(f)(3)(B)</u>

Defendants contend that the United States fails to set forth a claim for discrimination under 42 U.S.C. § 3604(f)(3)(B), which provides "discrimination" to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford . . . [a] person equal opportunity to use and enjoy a dwelling." (emphasis added). *See* MTD, 13-17. However, Defendants raise a false construct, contending that the United States has to plead the elements of a reasonable accommodation claim, i.e., that the requested accommodation is "'(1) reasonable and (2) necessary to (3) afford handicapped persons an equal opportunity to use and enjoy housing.'" *Lapid–Laurel, L.L.C. v. Zoning Bd. of Adjustment of the Twp. of Scotch Plains*, 284 F.3d 442, 457 (3d Cir. 2002) (citing *Bryant Woods Inn v. Howard County*, 124 F.3d 597, 603 (4th Cir. 1997). *See also Vorcheimer v. Philadelphian Owners Association*, 903 F.3d 100, 105 (3rd Cir. 2018).

But the issue in this case does not turn on whether the testers' specific, individual requests were reasonable or necessary. The issue is that, as a result of Defendants' categorical rule, persons with disabilities who need emotional assistance animals are deterred from seeking and would be unable to obtain this type of accommodation at all. Defendants' refusal to consider such requests in the first place - before assessing or even receiving them - violates 42 U.S.C.§ 3604(f)(3)(B).

_____

*Altamonte Heights Condo. Ass'n, Inc.*, No. 6:11-cv-1637, 2012 WL 6562766, at *7 (M.D.Fla. Dec. 17, 2012).

In five tests that SWPLS conducted, the applicants asked permission to keep an emotional support animal needed by a household member at the property, including referencing a specific disability in four follow-up tests (a son with autism, a husband with post-traumatic stress disorder, a spouse with a stroke). ECF 17 ¶¶ 20-24.  The applicants also stated that they had or could provide documentation of the need for the specific emotional support animal from a healthcare provider.  *Id*. The agents did not request any additional information from these applicants, or suggest that the applicants take further steps so the provider could consider their specific requests.  Nor did the agents attempt to engage in an interactive process with the applicants to determine if other accommodations might meet the prospective tenant's needs.  Rather, the agents made clear, on each occasion, that Perry Homes was not open to granting accommodations to allow any prospective tenant to keep any emotional support animal.  *Id.*[7]

In clinging to a categorical rule of not making accommodations for emotional support animals in response to the prospective applicants' requests, Perry Homes' action amounted to a "refusal" to accommodate the needs of people with disabilities.  *See, Revock*, 853 F. 3d at 111 (liability attaches under § 3604(f)(30(B) where a provider's "refusal to accommodate" occurs after having "'had an idea of what accommodation [the plaintiff] sought'"); *see also*, *Allure Rehab Servs., LLC*, 2017 WL 4297237 at *4 and *5 ("a categorical refusal to provide ASL interpreters to deaf residents fails to make a reasonable accommodation and therefore violates the RA [Rehabilitation Act]," and, for the same reasons, the FHA); *Southwest Fair Hous. Council v. WG Scottsdale LLC,* No. 19-00180, 2021

---

[7] Defendants also contend that they did not deny an accommodation because the testers did not engage in the interactive process, and failed to explain why an alternative was "somehow unreasonable or inadequate."  ECF 19-9 and 15.  But the burden to inquire or explore alternatives is on the landlord, not the prospective tenants.    *See, Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 895 (7th Cir. 1996) ("If a landlord is skeptical of a tenant's alleged disability or the landlord's ability to provide an accommodation, it is incumbent upon the landlord to request documentation or open a dialogue.").

WL 857372 *13 (D. Ariz. Mar. 8, 2021) (defendants' motion for summary judgment on plaintiff's reasonable accommodation claim denied where defendant's "employees denied Plaintiff's tester's requests [on behalf of deaf relatives] for an ASL interpreter on multiple occasions").

Further, it would have been futile to engage in discussions with Perry Homes about a specific accommodation for an emotional support animal since the agents made clear that such animals are not permitted at all.  A housing applicant need not engage in futile gestures to establish a reasonable accommodation claim.  *See*, *Lapid–Laurel, L.L.C.*, 284 F.3d 442 at n.5 (finding that a zoning applicant need not apply for a variance to request an accommodation if the outcome is futile); *Assisted Living Associates of Moorestown, L.L.C. v. Moorestown Township,* 996 F. Supp. 409, 426 (D.N.J. 1998) (holding that it was futile for an applicant to apply for a variance as a reasonable accommodation where Township's planning witness testified that it is "extremely unlikely" that a variance would be granted); *Cuomo,* 2019 WL 4805550 at *14 (holding that "[p]laintiffs have adequately alleged that the [ ] Defendants had categorical policies against wheelchairs and that any request for a reasonable accommodation would have been futile.  Accordingly, their failure to specifically ask for an accommodation does not render their allegations insufficient, and the [ ] Defendants' motions to dismiss the reasonable accommodation claim are denied").

The same principle applies here.  It would have been futile for the testers to engage further, even if they had the burden to do so, once they learned that Defendants do not allow emotional support animals.  *See, e.g*., *Davoll v. Webb*, 194 F.3d 1116, 1133 (10th Cir. 1999) (Defendant's policies against a particular type of accommodation under the ADA "foreclosed the only reasonable accommodation that could have assisted plaintiffs – reassignment.  Under such circumstances, plaintiffs could rely on the futile gesture doctrine.").

## V.       Conclusion

Based on the above, the Amended Complaint of the United States provides sufficient factual allegations to state a "plausible claim for relief" under Rule 12(b)(6).  For the reasons stated herein, Defendants' Motion to Dismiss should be denied.

Dated: November 29, 2021

Respectfully submitted,

MERRICK B. GARLAND
Attorney General

CINDY K. CHUNG
United States Attorney Western
District of Pennsylvania

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

___/s/ Jacqueline Brown_____
JACQUELINE C. BROWN
Assistant United States Attorney
Civil Division
Office of the U.S. Attorney
Western District of Pennsylvania
700 Grant Street, Suite 4000
Pittsburgh, PA 15219
Tel: (412) 894-7565
Mobile: (412) 721-8693
E-mail: jacqueline.c.brown@usdoj.gov
PA Bar No. 330010

____/s/ Beth Pepper_____
SAMEENA SHINA MAJEED
Chief, Housing and Civil Enforcement Section
CATHERINE A. BENDOR
Special Litigation Counsel
BETH PEPPER
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
150 M Street, NE
Washington, DC 20002
Tel: (202) 340-0916
E-mail: Beth.Pepper@usdoj.gov

*Attorneys for Plaintiff United States of America*